EDITH H. JONES, Chief Judge, with JERRY E. SMITH, EDITH BROWN CLEMENT, JENNIFER WALKER ELROD and HAYNES, Circuit Judges,
concurring in part and dissenting in part:
The first object of the First Amendment is to protect robust political debate that *436 underpins free citizens’ ability to govern ourselves. “Speech is an essential mechanism of democracy, for it is the means to hold officials accountable to the people .... The First Amendment has its fullest and most urgent application to speech uttered during a campaign for political office.” Citizens United v. FEC, — U.S. -1, 130 S.Ct. 876, 898,-L.Ed.2d-(2010) (internal citations and quotations omitted). Yet the majority hold that Congress may forbid a political party from broadcasting an advertisement explaining why the party supports its own congressional candidate merely because the advertisement was coordinated with the candidate as to timing.
We dissent. The Cao Ad cannot be suppressed by the FEC on the facts before us.[1]
The majority’s errors are procedural as well as substantive. Taking a most unorthodox approach to First Amendment adjudication, they assert that the “sole” issue before the court is “whether Congress may regulate a party’s own speech, meaning speech that is paid for by the party and adopted by the party regardless of coordination with the candidate.” This is not the “sole” issue. The record clearly presents a narrower controversy' — timing-only coordination. The majority opinion ignores the stipulated facts and argument presenting the Cao Ad dispute just as it ignores the FEC’s concession in oral argument that this dispute touches the outer boundary of the agency’s regulatory authority. The usual path of constitutional adjudication is first to consider the fact-based issue and to reach broader constitutional questions only if they are inescapably presented. Citizens United, 130 S.Ct. at 918 (Roberts, C.J., concurring). The majority stand this tradition on its head.
Substantively, the majority analysis, flawed by its overbroad premises, ultimately begs the primary question before us — at what point does “coordination” between a candidate and a political party transform the party’s communicative speech into a mere “contribution” subject to strict dollar limits? This question was left open by the Supreme Court. FEC v. Colorado Republican Fed. Campaign Comm., 533 U.S. 431, 456, n. 17, 121 S.Ct. 2351, 2366 n. 17, 150 L.Ed.2d 461 (2001) (“Colorado II”). In light of subsequent Supreme Court decisions, courts must begin to deal with it.[2]
Because the majority fail to join issue with the stipulated facts, their opinion cannot defend against the party’s as-applied challenge to 2 U.S.C. §§ 441a(d)(2), (3), and (a)(2)(A). But for the issue of “coordination” with the candidate as to its broadcast, the Cao Ad would be speech by the RNC fully protected by the First Amendment. Cf. FEC v. Wisconsin Right to Life, Inc., 551 U.S. 449, 467, 127 S.Ct. 2652, 2665 n. 4, 168 L.Ed.2d 329 (2007) *437 (“WRTU’); Citizens United, 180 S.Ct. at 908-10. In this as-applied challenge, the government had the burden to show that this expressive but minimally coordinated speech may be subjected to the strict limits reserved for monetary contributions. WRTL, 551 U.S. at 467, 127 S.Ct. at 2665 n. 4. I conclude, after performing the necessary analysis, that the government may not infringe the party’s right to speak in this manner.
The foregoing propositions are elaborated in three steps. First, I will restate the obvious, that a narrower, fact-based challenge was presented to the court. Second, according to well settled precedent, the narrower issue ought to be decided. Third, I address the as-applied challenge on its merits, placing the burden on the government.[3]

I. A Narrow Fact-Based Challenge Is Before The Court

The majority state that “the record unambiguously reflects that the RNC’s sole challenge in this case with regards to the Cao Ad is whether Congress may regulate a party’s own speech, meaning speech that is paid for by the party and adopted by the party regardless of coordination with the candidate.” Indeed, the majority devote nearly as much discussion to justifying their “sole challenge” approach as they do to rejecting the challenge. Despite the majority’s contentions, the court is obliged to address the facts that have actually been presented- — specifically, whether this particular ad can be regulated as a defacto contribution even though the coordination regarded solely the timing of its broadcast.[4]
It is important to stress just how minimal was the level of coordination. When the Supreme Court has interpreted the term “coordinated expenditures,” it described a spectrum, at one end of which political parties would simply foot the candidate’s bills. Colorado II, 533 U.S. at 439, 460, 121 S.Ct. at 2357, 2368. The present scenario stands at the other end. The Republican Party sought to broadcast this ad supporting Congressman Cao before the 2008 election:
Why We Support Cao
The Republican National Committee has long stood for certain core principles, which we believe are the fundamentals of good government. When it comes to the issues of lower taxes, individual freedoms and a strong national defense, we need leaders who will stand with the American people and defend those issues.
We need leaders who understand that our economy is in a recession, our individual freedoms are constantly under attack and we continue to fight the global war on terrorism to keep our families safe.
Joseph Cao understands and fights for those issues. And, that is why we ask you to join us in supporting him on *438 December 6. It’s important for Louisiana and important for the country.
Stipulated Facts ¶ 31.
The ad was produced and approved by the RNC, on its own initiative, without any input from Cao. Cao and the RNC intended to cooperate only as to the timing of the ad. Timing constituted the only coordination. Stipulated Facts ¶ 32. There is no evidence that Cao suggested, instigated or requested the ad. There is no evidence that he or his campaign wrote it or provided their views on its content. There is no evidence that the ad might have caused Cao to spend his campaign funds any differently. Thus, whether or not such de minimis coordination allows the Cao Ad to be banned as a “coordinated expenditure” is before the court for decision.
The plaintiffs raised this precise issue in their briefing. They assert that “[i]f the degree [of coordination] matters, FEC must concede that as applied to the Cao Ad coordination is de minimis and non-cognizable.” (emphasis added). Their contentions are best summed up as follows:
The open question in Colorado-II asks both (a) whether some own-speech communications may not be regulated because coordination is de minimis (e.g., just timing) and (b) whether all such communications are too much like independent expenditures to be limited regardless of coordination degree. Under the former, degree matters and expenditures for the Cao Ad may not be treated as contributions. Under the latter, degree does not matter and none of RNC’s proposed own-speech activities may be so treated.
Reply Brief, at 10.
Lest there be doubt, the plaintiffs’ desire to run the Cao Ad without fear of prosecution or investigation permeates their initial brief to this court as it did their arguments in the district court. The plaintiffs’ statement of facts asserts: “Specifically, the RNC intended to make an expressive advocacy radio ad (‘Cao Ad’), if legally permitted by the judicial relief sought in this case. (R.278-79). The RNC intended to coordinate the Cao Ad with Cao as to the best timing for it, but otherwise it would not be coordinated with Cao.”[5]
Plaintiffs’ brief goes on to explain their theory about the distinction between political contributions, which the Supreme Court has held are amenable to government regulation as symbolic expressions of political support, and expenditures, which the Court considers fully protected under the First Amendment because they “communicate the underlying basis for support.” See Buckley v. Valeo, 424 U.S. 1, 19-21, 96 S.Ct. 612, 634-35, 46 L.Ed.2d 659 (1976). The Federal Election Campaign Act treats all “coordinated expenditures” between third parties and their favored candidates as contributions, and therefore subject to rigid dollar limits.[6] Plaintiffs, however, would have this court acknowledge the constitutional protection of “coordinated expenditures” that represent com *439 municative statements of their reasons for supporting a candidate. Thus, they asserted broadly in their brief that communicative activities attributable to and paid for by the RNC become its “own speech” irrespective of coordination with Cao. But they also more narrowly assert that the Cao Ad is attributable to the RNC:
[The Cao Ad] communicates the underlying basis for support for the candidate and his views, ie., it is not merely symbolic expression of support. Coordination with Rep. Cao as to timing would in no way alter the fact that this ad would be RNC’s own speech. The ad is plainly more in the nature of a party’s own speech than in the nature of merely paying a candidate’s bills. Disbursements for it would be expenditures, not contributions. They may not be limited as if they were contributions.
Finally, plaintiffs’ brief returns to the Cao Ad in the course of asserting that the government cannot sustain its burden of justifying this limit on coordinated expenditures that embody a party’s political speech:
Another reason it was difficult was that RNC couldn’t have written the Cao Ad if it were an independent expenditure because, to create the necessary independence, “this would have had to have been made through an outside consultant” ....
At the time RNC wanted to speak through the Cao Ad, it was not practically possible to firewall off RNC staff in order to do an independent expenditure
For all the majority’s quotations intended to support their characterization of plaintiffs’ broader argument as the “sole challenge,” resting entirely on hypothetical grounds, there is not a word of waiver[7] by plaintiffs of any ground of relief generated by their case.[8] That plaintiffs’ oral argument before this court is broadly phrased is hardly a novel tactic, especially when the line between facial and as-applied challenges to statutes is “not so well defined that it has some automatic effect or that it must always control the pleadings and disposition in every case involving a constitutional challenge.” Citizens United, 130 S.Ct. at 893. The district court, however, was well aware that plaintiffs’ object is to obtain a ruling that defines, or begins to define, where certain coordinated activities of the RNC with Congressman Cao lie along the spectrum running from “functional monetary contributions” to full- *440 throated political advocacy.[9] The specifically defined activity here was the production and planned broadcast of the Cao Ad. Having raised this issue in the district court and to this court, the plaintiffs are entitled to an answer.

II. The Court Must Address Narrow Issues First

The majority hardly need reminding of the cardinal principle of constitutional adjudication that a court should address the case presented by the facts before it rather than broad, hypothetical scenarios. Courts should neither “anticipate a question of constitutional law in advance of the necessity of deciding it” nor “formulate a rule of constitutional law broader than is required by the precise facts to which it is to be applied.” Ashwander v. TVA, 297 U.S. 288, 346-47, 56 S.Ct. 466, 483, 80 L.Ed. 688 (1936) (Brandéis, J.) (quoting Liverpool, N.Y. & Philadelphia Steamship Co. v. Emigration Commissioners, 113 U.S. 33, 39, 5 S.Ct. 352, 355, 28 L.Ed. 899 (1885)); Wash. State Grange v. Wash. State Rep. Party, 552 U.S. 442, 450-51 128 S.Ct. 1184, 1191 (2008). Going beyond our “case or controversy” limits spawns advisory opinions that are likely to be ill-informed.
The majority opinion falls into this trap. Rather than address the stipulated facts about the Cao Ad, which have been fairly “passed upon” in the parties’ briefs and by the district court, the majority considers the application of Colorado II to all “speech” “adopted by a political party.” The majority propose an answer to the broadest possible question before the court, extending the reach of their decision well beyond the factual record. Their overbroad approach leads to at least one serious mistake as they conflate the plaintiffs’ “own speech” argument with every conceivable “expenditure” whose “coordination” is deemed by FECA to be the functional equivalent of a simple monetary contribution. Thus, they conclude, adopting the “own speech” argument would “effectually overrule” the Supreme Court’s decision in Colorado II that facially upheld dollar limits on coordinated expenditures. This is plainly wrong.
The Supreme Court,[10] the district court,[11] the plaintiffs[12] and the FEC[13] all *441 recognize that “coordinated expenditures” range on a spectrum from those that are more independently communicative of a supporter’s views to those more like money contributions, which Buckley v. Valeo characterizes as mere symbolic expression. The majority employs a meat cleaver instead of a scalpel in the most sensitive constitutional area of political speech.
The majority’s overbreadth is even more disturbing because the Supreme’ Court proceeded with constitutional caution in the political contribution cases that concern us here. In Colorado I, the Court, rejecting the FEC’s meat cleaver approach that would have deemed all political party expenditures as “coordinated” with candidates, upheld an as-applied challenge allowing independent expenditures. Colorado Republican Campaign Comm. v. FEC, 518 U.S. 604, 623-24, 116 S.Ct. 2309, 2319, 135 L.Ed.2d 795 (1996) (“Colorado I”). The Court then remanded for fuller consideration of the party’s facial challenge to FECA’s coordinated expenditure provision. Id. at 625-26, 116 S.Ct. at 2320-21. When the Court later took up and rejected the facial challenge in Colorado II, it nonetheless acknowledged a potential for future as-applied attacks:
Whether a different characterization, and hence a different type of scrutiny, could be appropriate in the context of an as-applied challenge focused on application of the limit to specific expenditures is a question that, as Justice Thomas notes, post, at 468, n. 2 [121 S.Ct. 2351], we need not reach in this facial challenge. Cf. Brief for Petitioner 9, n.5 (noting that the FEC has solicited comments regarding possible criteria for identifying coordinated expenditures). The Party appears to argue that even if the Party Expenditure Provision is justified with regard to coordinated expenditures that amount to no more than payment of the candidate’s bills, the limitation is facially invalid because of its potential application to expenditures that involve more of the party’s own speech. Brief for Respondent 48-49. But the Party does not tell us what proportion of the spending falls in one category or the other, or otherwise lay the groundwork for its facial over breadth claim. Cf. Broadrick v. Oklahoma, 413 U.S. 601, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973) (overbreadth must be substantial to trigger facial invalidation).
Colorado II, 533 U.S. at 456, 121 S.Ct. at 2366 n. 17.
Thus, the Court majority expressly recognized, as did the dissent, the potential for as-applied challenges to coordinated expenditures that express the contributor’s basis for supporting a candidate. See also Colorado II, 533 U.S. at 468, 121 S.Ct. at 2373 (Thomas, J. dissenting).[14] The litiga *442 tion history of the Colorado case demonstrates the Court’s methodical migration from a narrow to a broader challenge of the FECA provision.
The Court took a similar approach in Citizens United. It first analyzed the plaintiffs’ arguments that Hillary: The Movie did not fall within statutory prohibitions on corporate electioneering communications and, only after rejecting those, reached the ultimate constitutionality of the ban. Chief Justice Roberts explained:
It is only because the majority rejects Citizens United’s statutory claim that it proceeds to consider the group’s various constitutional arguments, beginning with its narrowest claim (that Hillary is not the functional equivalent of express advocacy) and proceeding to is broadest claim (that Austin v. Michigan Chamber of Commerce, 494 U.S. 652, 110 S.Ct. 1391, 108 L.Ed.2d 652 (1990) should be overruled). This is the same order of operations followed by the controlling opinion in Federal Election Comm’n v. Wisconsin Right to Life, Inc., 551 U.S. 449, 127 S.Ct. 2652, 168 L.Ed.2d 329 (2007) (WRTL). There the appellant was able to prevail on its narrowest constitutional argument because its broadcast ads did not qualify as the functional equivalent of express advocacy; there was thus no need to go on to address the broader claim that McConnell v. Federal Election Comm’n, 540 U.S. 93, 124 S.Ct. 619, 157 L.Ed.2d 491 (2003), should be overruled. WRTL, 551 U.S., at 482, 127 S.Ct. 2652, 168 L.Ed.2d 329; id., at 482-483, 551 U.S. 449, 127 S.Ct. 2652, 168 L.Ed.2d 329 (ALITO, J., concurring). This case is different — not, as the dissent suggests, because the approach taken in WRTL has been deemed a “failure,” post, at 935 [130 S.Ct. 876], but because, in the absence of any valid narrower ground of decision, there is no way to avoid Citizen United’s broader constitutional argument.
Citizens United, 130 S.Ct. at 918 (Roberts, C.J., concurring). The Chief Justice also noted that the WRTL decision rested on a narrower constitutional basis.
The majority’s approach cannot be salvaged by their re-characterization of the plaintiffs’ “own speech” argument as a “facial attack” no different from the one rejected by the Supreme Court in Colorado II. It is true that the line between facial and as-applied constitutional challenges is not well defined. Citizens United, 130 S.Ct. at 893. But it is also true that courts have the authority to re-frame these arguments to subserve judicial restraint[15] and in recognition that the distinction “goes to the breadth of the remedy employed by the Court, not what must be pleaded in a complaint.” Id. (Kennedy J.) (citing United States v. Nat Treas. Emp’s Union, 513 U.S. 454, 477-78, 115 S.Ct. 1003, 1018-19, 130 L.Edüd 964 (1995)).[16] It follows from *443 these principles that the parties “cannot enter into a stipulation that prevents the Court from considering certain remedies if those remedies are necessary to resolve a claim that has been presented.” Citizens United, Id. at 893.[17] Thus, it is improper for the majority to conclude that plaintiffs have somehow pled or argued themselves out of court. Recharacterizing the plaintiffs’ position as a facial attack cannot eliminate the narrower issue concerning the Cao Ad.
This court has the duty to decide the case on stipulated facts brought properly before us.

III. Evaluating Coo’s As-Applied Challenge

In this as-applied attack on the coordinated expenditure limit that would ban broadcast of the Cao Ad, this court must first determine the appropriate level of scrutiny and then evaluate the evidence concerning the government’s regulation. WRTL, 551 U.S. at 456, 127 S.Ct. at 2659 (“With the standard [of scrutiny] thus settled, the issue remains whether adequate evidentiary grounds exist to sustain the limit under that standard[.]”). Two levels of scrutiny govern campaign finance regulations: strict scrutiny and, unique to campaign finance jurisprudence, “closely drawn” scrutiny. Buckley v. Valeo, 424 U.S. 1, 25, 96 S.Ct. 612, 638, 46 L.Ed.2d 659 (1976). The former has been applied to candidates’ speech and independent expenditures, while the latter applies to contributions and facially to “coordinated expenditures.” Which standard pertains to the government’s regulation of the Cao Ad depends on whether the ad is core political speech (see Citizens United, 130 S.Ct. at 890-91), or a functional contribution. This court is not bound by the government’s simply labeling the speech “coordinated”:
[W]e recognize that the FEC may have characterized the expenditures as “coordinated” in light of this Court’s constitutional decisions prohibiting regulation of most independent expenditures. But, if so, the characterization cannot help the Government prove its case. An agency’s simply calling an independent expenditure a “coordinated expenditure” cannot (for constitutional purposes) make it one. See, e.g., NAACP v. Button, 371 U.S. 415, 429, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963) (the government “cannot foreclose the exercise of constitutional rights by mere labels”); Edwards v. South Carolina, 372 U.S. 229, 235-238, 83 S.Ct. 680, 9 *444 L.Ed.2d 697 (1963) (State may not avoid First Amendment’s strictures by applying the label “breach of the peace” to peaceful demonstrations).
Colorado I, 518 U.S. at 621-22, 116 S.Ct. at 2319 (emphasis added).
Buckley held that contributions to a candidate may be regulated, because contributions, unlike communicative independent expenditures, express merely a general support for a candidate. Buckley, 424 U.S. at 21, 96 S.Ct. at 635. The FECA defines contributions as including “expenditures made by any person in cooperation, consultation, or concert, with, or at the request or suggestion of, a candidate.” 2 U.S.C. § 441a(a)(7)(B)(i). While the Supreme Court has placed great importance on whether speech is coordinated, and thus regarded as a contribution, it has offered no guidance except to acknowledge that the sweeping term “coordinated expenditures” covers a wide range of activities with varying constitutional attributes:
The principal opinion in Colorado I noted that coordinated expenditures “share some of the constitutionally relevant features of independent expenditures.” 518 U.S., at 624 [116 S.Ct. 2309]. But it also observed that “many [party coordinated expenditures] are ... virtually indistinguishable from simple contributions.” Ibid. Coordinated spending by a party, in other words, covers a spectrum of activity, as does coordinated spending by other political actors.
Colorado II, 533 U.S. at 444^5, 121 S.Ct. at 2361.
There is no doubt that, standing alone, the Cao Ad is core political speech. The Cao Ad is more than “a general expression of support for the candidate.” Buckley, 424 U.S. at 21, 96 S.Ct. at 635; see also Citizens United, 130 S.Ct. at 890 (“[T]here is no reasonable interpretation of Hillary [the movie] other than as an appeal to vote against Senator Clinton, ... [T]he film qualifies as express advocacy.”). The ad expressly advocates for Cao, “communicate[s] the underlying basis for [the RNC’s] support,” and increases “the quantity of communication.” Buckley, 424 U.S. at 21, 96 S.Ct. at 635.
Further, the ad hews closely to the independent expenditure side of the spectrum. The RNC independently produced the Cao Ad without input from Cao; the RNC created the ad at its own initiative; the RNC planned the ad’s message; the RNC produced the ad; the RNC approved the final version of the ad; and the RNC decided to air the ad. Like the ads in Colorado I, the Cao Ad “was developed by the [party] independently and not pursuant to any general or particular understanding with a candidate.” Colorado I, 518 U.S. at 614, 116 S.Ct. at 2315.[18] It unambiguously “reflects [the RNC’s] members’ views about the philosophical and governmental matters that bind them together [and] also seeks to convince others to join those members in a practical democratic task, the task of creating a government that voters can instruct and hold responsible for subsequent success or failure.” Id. at 615-16, 116 S.Ct. at 2316.
At the opposite end of the coordination spectrum are instances in which a party *445 simply pays its candidate’s bills. See Buckley, 424 U.S. at 46, 96 S.Ct. at 648 n. 53; see also Colorado I, 518 U.S. at 624, 116 S.Ct. at 2320. Apparently rejecting the spectrum approach, the FEC asserts that the Cao Ad is functionally the same as a cash contribution to the candidate. This is inaccurate. The critical differences between the Cao Ad and a direct contribution or “footing the candidate’s bills” include the ad’s initiator, message, quality, ultimate source of approval, and decision to air. The Cao Ad is not “virtually identical” to one that Cao might produce. See Cao, 688 F.Supp.2d at 533 (explaining that Cao found many independent expenditures to be counterproductive and harmful). Further, despite the timing coordination, the ads “may well provide little assistance to the candidate’s campaign and indeed may prove counterproductive.” Buckley, 424 U.S. at 47, 96 S.Ct. at 648. Because the party decides to create and air the ad of its own initiative, the candidate cannot depend on it. The candidate will not know whether the ad is effective. If the ad is useful to the candidate, then it is useful only because the interests of the party and the candidate coincide. On all these grounds, there is no significant functional difference between the Cao Ad and a constitutionally protected independent expenditure.
Compared with the Colorado II pronouncement that the coordinated expenditure limits are facially valid, this case presents the narrow question whether de minimis coordination transforms otherwise constitutionally protected core political speech into something less. We believe it does not. Because the Cao Ad represents core political speech, it should be evaluated under the traditional strict scrutiny test. See Colorado II, 533 U.S. at 443-44, 121 S.Ct. at 2360; Colorado I, 518 U.S. at 614-15, 116 S.Ct. at 2315;. Alternatively, even if “closely drawn” scrutiny is required because of Colorado II, the Cao Ad cannot be subjected to dollar limits.
A. Applying Strict Scrutiny
That a statute has been held facially valid does not answer whether it may be constitutionally applied in a specific circumstance. WRTL, 551 U.S. at 464, 127 S.Ct. at 2663-64. Instead “[a] court applying strict scrutiny must ensure that a compelling interest supports each application of a statute restricting speech.” WRTL, 551 U.S. at 464-65, 127 S.Ct. at 2664; id. at 477-78, 127 S.Ct. at 267; See also Citizens United, 130 S.Ct. at 898, 130 S.Ct. 876 (justifying regulation of speech “requires the Government to prove that the restriction furthers a compelling interest and is narrowly tailored to achieve that interest.” (internal quotation marks omitted)); First Nat’l. Bank of Boston v. Bellotti 435 U.S. 765, 786, 98 S.Ct. 1407, 1421, 55 L.Ed.2d 707 (1978). Moreover, the government bears the burden to demonstrate that the law is constitutional as applied to plaintiffs’ speech. WRTL, 557 U.S. at 464, 127 S.Ct. at 2663.
The government contends that regulating timing-only coordination furthers its compelling interest in preventing corruption or its appearance or circumvention of the contribution limits. The FEC also argues that an expansive definition of “coordination” is necessary to ensure that it can regulate all coordinated expenditures that truly are de facto contributions. But because the Cao Ad represents expressive political speech, the government’s position cannot be squared with WRTL:
This Court has long recognized “the governmental interest in preventing corruption and the appearance of corruption” in election campaigns. Buckley, 424 U.S., at 45, 96 S.Ct. 612, 46 L.Ed.2d 659. This interest has been invoked as *446 a reason for upholding contribution limits. As Buckley explained, “[t]o the extent that large contributions are given to secure a political quid pro quo from current and potential office holders, the integrity of our system of representative democracy is undermined.” Id., at 26-27, 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659. We have suggested that this interest might also justify limits on electioneering expenditures because it may be that, in some circumstances, “large independent expenditures pose the same dangers of actual or apparent quid pro quo arrangements as do large contributions.” Id., at 45, 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659.
McConnell arguably applied this interest — which this Court had only assumed could justify regulation of express advocacy — to ads that were the “functional equivalent” of express advocacy. See 540 U.S. at 204-206, 124 S.Ct. 619, 157 L.Ed.2d 491. But to justify regulation of WRTL’s ads, this interest must be stretched yet another step to ads that are not the functional equivalent of express advocacy. Enough is enough. Issue ads like WRTL’s are by no means equivalent to contributions, and the quid-pro-quo corruption interest cannot justify regulating them. To equate WRTL’s ads with contributions is to ignore their value as political speech. Appellants argue that an expansive definition of “functional equivalent” is needed to ensure that issue advocacy does not circumvent the rule against express advocacy, which in turn helps protect against circumvention of the rule against contributions. Cf. McConnell, supra, at 205, 124 S.Ct. 619 (“[RJecent cases have recognized that certain restrictions on corporate electoral involvement permissibly hedge against circumvention of [valid] contributions limits” (internal quotation marks omitted; brackets in original)). But such a prophylaxis-upon-prophylaxis approach to regulating expression is not consistent with strict scrutiny.
WRTL, 551 U.S. at 478-79, 127 S.Ct. at 2672.
The import of WRTL is clear. Even if the record afforded some support for regulating timing-only coordination, which it does not, discussed infra, it clearly does not support treating the Cao Ad as the “functional equivalent” of a mere monetary contribution. The expressive content of the ad prevents that. In addition, the risk of circumvention of campaign contribution limits is not appreciably greater here than it is with “independent” expenditures. The candidate lacks control or influence over the initiation, production, and content of the party ad. The party decides whether or not an ad will be made, what it will say, what it will look like, and whether it will air. The candidate may or may not approve of the ad or find it useful.
Consequently, this expenditure will be useful to the candidate only to the extent that his and the party’s interests coincide. Should the candidate “encourage” donors to give money to the party, he cannot be certain whether these party donations will be more useful to him than an independent expenditure. Without some link of candidate control or influence, neither the quid pro quo corruption nor appearance of corruption that justifies contribution limits can occur. Colorado II, 533 U.S. at 464, 121 S.Ct. at 2370 (discussing a “link in a chain of corruption by-conduit”); Citizens United, 130 S.Ct. 876, 908 (preventing corruption or its appearance is the government’s only valid interest in limiting political speech).
The FEC essentially argues, as it did in WRTL, that expansive definitions of coordination and coordinated expenditures are *447 needed to ensure that coordinating solely the broadcast timing of the party’s ad does not circumvent the rule against coordinated expenditures which in turn helps to prevent circumvention of contribution limits which culminates in preventing quid pro quo corruption or the appearance of such corruption. This is no more than the “prophylaxis-upon-prophylaxis” speculation rejected by WRTL, 551 U.S. at 479, 127 S.Ct. at 2672. It is an overly broad approach that here sweeps up protected speech. And the government’s logic, that the greater coordination includes the lesser (this coordination), is unambiguously rejected by WRTL: “This greater-includes-the-lesser approach is not how strict scrutiny works .... A court applying strict scrutiny must ensure that a compelling interest supports each application of a statute restricting speech.” 551 U.S. at 477-78,127 S.Ct. at 2671.[19]
B. Applying “Closely Drawn” Scrutiny
Even if the regulation of the Cao Ad must be evaluated under Buckley’s, “closely drawn” standard because of its de min-imis coordination, the government still must affirmatively demonstrate some sufficiently important interest — preventing corruption, the appearance of corruption, or circumvention. Buckley, 424 U.S. at 25, 96 S.Ct. at 638 (contribution limits may be upheld only if the “[sjtate demonstrates a sufficiently important interest and employs means closely drawn to avoid unnecessary abridgment of associational freedoms” (emphasis added)); Edenfield v. Fane, 507 U.S. 761, 770-71, 113 S.Ct. 1792, 1800, 123 L.Ed.2d 543 (1993) (when regulating speech under intermediate scrutiny, the government must “demonstrate that the harms it recites are real” and that standard is “not satisfied by mere speculation or conjecture.”) The government remains obliged to present evidence that the interest applies to the facts before us. McConnell v. FEC, 540 U.S. 93, 144, 185 n. 72, 124 S.Ct. 619, 661, 684, 157 L.Ed.2d 491 (2003); Colorado II, 533 U.S. at 457, 121 S.Ct. at 2367. Not to require some level of proof by the government would allow censorship of the party’s ad based on nothing more than the general proof offered to sustain the statute’s facial validity in Colorado II.
The FEC offered no evidence or argument that coordination of the Cao Ad as to broadcast timing will appreciably increase the risk or appearance of corruption or circumvention of contribution limits. The record contains fifty-nine exhibits spanning thousands of pages, much of which was part of the record in Colorado II or McConnell. There are academic studies, expert testimony before Congress, invitations to various events put on by political parties, and many affidavits by politicians, former politicians, and political advisors. Overall, the record evidence proves that money plays a primary role in political campaigns, that parties and party leaders are significantly involved in political fund-raising, and that independent groups have played an increasing role in recent years. More money than ever is being raised, and election advertising has become more important and more of a science than ever before. Frequently, this money, whether it travels through campaigns, parties, or independent groups, opens up opportunities for ac *448 cess to candidates and politicians. In short, despite FECA, as amended by McCain-Feingold, money and politics remain inextricably linked, and may be more entangled than they were at the time of FECA’s passage.[20]
None of this, however, demonstrates that the specific type of coordination at issue in this case, concerning the timing of otherwise-independent expenditures, has any propensity to increase quid pro quo corruption or the appearance of corruption or to promote circumvention of contribution limits. Indeed, the voluminous evi-dentiary record contains only a few, incidental references to timing coordination. For example, a campaign finance expert opines that “Giving candidates a direct say in whether, when, and how often a party’s speech is broadcast essentially gives them a direct say in the content of what the voters get to hear.” Content, however, is not at issue in this ease. A former politician states that party advertisements in the final days of a campaign can make the difference between winning and losing. Coordination is hardly necessary to draw that conclusion. One campaign consultant complained that “the clutter on television during the last few weeks of the campaign really prevented our message from getting through as clearly as we would have liked.” No doubt. What is absent from the record is any discussion or evaluation (let alone evidence) on whether timing coordination increases the risk of corruption or its appearance. Instead, the record simply includes blanket conclusions that any coordination increases the risk.
In contrast, the general evidence demonstrating risks of circumvention presented in Colorado II involved situations where the candidate retained real control over the party’s coordinated expenditures. Candidates controlled the message and its presentation and, ultimately, approved of those coordinated expenditures. See 533 U.S. at 457-60, 121 S.Ct. at 2367-68. Here, Cao had no influence over the RNC’s speech save what time it would air. The candidate does not even have input into whether or on what stations the ad will air, only when it will air, and he cannot be certain that the party will heed his advice. If there is any heightened possibility of corruption or circumvention in this arrangement, the government has not pointed to it, and we ought not to invent some conceivable interest that the government itself is unable to articulate or prove.
Nor, in this instance, are entirely uncoordinated expenditures an adequate alternative to minimally coordinated speech. The record demonstrates that FEC’s coordination-regulation regime prevents party leaders from exercising any degree of control over their party’s advertisements in support of a candidate.[21] Because party *449 leaders inevitably associate with candidates, to avoid the taint of coordination parties must establish “independent expenditure programs” staffed by hired consultants who are responsible for all aspects of the party’s communications, from polling and research to writing the scripts, but for the topline budget. In effect, a party has no control over its own message. The party leaders must make a Hobson’s choice between talking to their own candidates and controlling their own party’s message. The government justifies this regime by reference to the risk of “circumvention.” But by prohibiting speech subject to de minimis coordination, the FEC severely abridges parties’ constitutionally protected right to engage in independent expenditures — in other words, to speak in public in support of their own candidates. After Citizens United, a party is more constrained in its ability to engage in political speech than a run-of-the-mill business or corporation.
“Closely drawn” scrutiny has to mean something when applied to censorship of core political speech. Where the government cannot demonstrate a compelling interest, and the effect of regulation in this ease is to ban the Cao Ad, the regulation cannot be “closely drawn.”

TV. The Majority Opinion

Even taking the majority on their own terms, Colorado II does not foreclose the plaintiffs’ broader “own speech” argument. As we have noted, the majority’s analysis of the plaintiffs’ “own speech” argument simply misses the point: it is speech, not pencils, that the RNC has paid for. The spectrum of expenditures that may be coordinated with a candidate is potentially limitless. Coordinated expenditures that are functionally like monetary contributions, and are only symbolically expressive according to Buckley’s dichotomy, continue to fall comfortably within the range in which monetary limits must be upheld to prevent quid pro quo corruption or the appearance of such corruption. Consequently, the majority’s fear that the bottom would fall out of FEC regulation of coordinated expenditures if RNC succeeds here is groundless.
Second, because the Cao Ad is undeniably core political speech, the majority is incorrect to dismiss the two most recent cases in which the Supreme Court has addressed whose communicative speech may be constitutionally limited and in what way. Neither Citizens United nor WRTL controls the present case, but both are informative; their bedrock defense of core political speech and their systematic approach to First Amendment standards of review cannot be waved away by reciting differences in degree, not kind, between the speakers and types of speech at issue. Finally, the majority’s treatment of plaintiffs’ “own speech” argument erases the distinction between facial and as-applied challenges. If the Cao Ad must be banned *450 as a coordinated expenditure, despite its provenance and character as core political speech, the majority opinion “eviscerates” both the acknowledgment in Colorado I and II of the wide spectrum of potentially coordinated expenditures and the recognition in Colorado II that as-applied challenges were foreseeable. In short, the plaintiffs may have reached beyond the grasp of judicial power by promoting a largely hypothetical “own speech” position. The majority, however, seriously abdicated their responsibility to protect First Amendment political speech and to apply governing Supreme Court authorities.

V. Conclusion

The constitutional rules governing campaign finance law are presently in a state of flux, see Green Party of Conn. v. Garfield, 616 F.3d 189, 2010 WL 2737134 (2d Cir. July 13, 2010), but there is a clear trend favoring the protection of political speech. Beginning with WRTL, the Supreme Court has, in measured steps, protected political speech while leaving the scaffolding of Buckley in place. It has cast aside both recently enacted speech restrictions, see WRTL, and decades-old speech restrictions, see Citizens United. Lower courts have conformed to this trend. SpeechNow.org v. FEC, 599 F.3d 686 (D.C.Cir.2010); N.M. Youth Organized v. Herrera, 611 F.3d 669 (10th Cir.2010).
In each of those instances, the Supreme Court has demanded, to justify banning speech, that the government provide strong evidence of a compelling interest in preventing the appearance or occurrence of corruption. Where there is uncertainty about the government’s interest, “the First Amendment requires us to err on the side of protecting political speech rather than suppressing it.” WRTL, 551 U.S. at 457, 127 S.Ct. at 2659. Like Wisconsin Right to Life’s issue ads or Citizen United’s Hillary: The Movie, the Cao Ad is core political speech. The RNC wishes to coordinate with Cao on its broadcast timing, but the Supreme Court has never spoken on what degree of contact makes expressive political speech “coordinated” such that it may be suppressed. The Supreme Court’s recent decisions demand much more from the government than it has presented here — essentially nothing. Even if the government were to meet its burden, it seems inconceivable that in this country founded on the hope and reality of free and open political debate, otherwise independent political speech could be banned because its speakers have asked a candidate, “When do we air the ad?”
It is not our place to revisit whether the government may generally regulate coordinated expenditures. Still less is it our place to approve the banning of a specific political ad simply because the Court has held that when coordinated expenditures are generally analogous to paying the candidates’s bills, they may be regulated. But when it comes to defining what speech qualifies as coordinated expenditures subject to such regulation — the issue we do have to decide — we should follow Chief Justice Roberts’s admonition in WRTL:
[W]e give the benefit of the doubt to speech, not censorship. The First Amendment’s command that “Congress shall make no law ... abridging the freedom of speech” demands at least that.
WRTL, 551 U.S. at 482, 127 S.Ct. at 2674. We respectfully dissent.

. While this dissent considers the narrow issue whether timing-only coordination of a political party's campaign speech with the candidate it supports may be prohibited by the FECA, Judge Clement’s opinion carries the implications of recent Supreme Court decisions further to protect political party “speech that is not the functional equivalent of a campaign contribution.” Our approaches are harmonious, reflecting different levels of generality.

. The majority “reads” this dissent as agreeing that Colorado II “authorizes regulation of RNC’s own speech generally.” Not so. We read Colorado II to acknowledge that expenditures coordinated between a party and a federal candidate range along a spectrum of expressiveness — less-“expressive” party donations like copying equipment clearly fall within the coordinated expenditure limits. More expressive forms of support by the party, however, enjoy stronger constitutional protection. The FEC itself admitted that the Cao Ad lies along the expressive side of the spectrum

. I concur in the rest of the majority opinion because the other issues are controlled by Supreme Court authority. This dissent concerns the majority’s disposition of certified questions 3 and 6.

. Responding to these facts, the majority contends that (a) Cao's counsel really disclaimed the narrower approach taken by this dissent and (b) counsel conceded not only timing but "content awareness” underlay the proposed coordination. This dissent responds fully to the former contention. As to the latter, after the past several years in litigation Cao would have to admit his awareness of the ad! In any event, it is the assertion of "content awareness” that first appeared in en banc oral argument and post-argument briefing. Timing-only is the only stipulation in the district court and therefore the only "fact” before us.

. The majority opinion is simply inaccurate in asserting that plaintiffs raised an as-applied challenge only in their reply brief.

. Justice Souter explained in Colorado II that expenditures coordinated with a candidate are contributions under FECA:
The simplicity of the distinction [between contributions and expenditures] is qualified, however, by the Act’s provision for a functional, not formal, definition of “contribution,” which includes “expenditures made by any person in cooperation, consultation, or concert, with, or at the request or suggestion of, a candidate, his authorized political committees, or their agents,” 2 U.S.C. § 441a(a)(7)(B)(i).
Colorado II, 533 U.S. at 438, 121 S.Ct. at 2356-57.

. To waive an issue, a party must have "the intention of forgoing it." Black's Law Dictionary (8th ed.2004); Kontrick v. Ryan, 540 U.S. 443, 458 n. 13, 124 S.Ct. 906, 157 L.Ed.2d 867 (2004) ("[W]aiver is the 'intentional relinquishment or abandonment of a known right.’ "(quoting United States v. Olano, 507 U.S. 725, 773, 113 S.Ct. 1770, 1777, 123 L.Ed.2d 508 (1993))).

. The majority make too much of an exchange during oral argument in which plaintiffs’ counsel stated that the Cao Ad was "coordinated.” The majority imply that the plaintiffs conceded that the Cao Ad was a "coordinated expenditure” under Colorado II, and therefore Colorado II controls this case. This is inaccurate. When the plaintiffs stated that the Cao Ad was "coordinated,” they were referring to the FEC regulations:
Judge Jolly: In other words you can sit down and discuss with them the degree of coordination on fifty ads and you can keep running that ad and running that ad on their time. And you’re running a number of ads and still it’s your speech notwithstanding the nth degree of coordination that you had.
Plaintiff’s Counsel: That's right. There's no degree of being pregnant. You’re either or not, and under their regulations, it is....
(emphasis added). Counsel conceded only FEC's regulatory interpretation of the consequences of timing-only coordination, not the constitutionality of that interpretation.

. Judge Berrigan’s order cites both Colorado ITs majority opinion and Justice Thomas’s dissent, explaining that several ‘'coordinated” activities are not equivalent to de facto contributions, but instead are genuine expenditures with only a minimal amount of coordination. Cao v. FEC, 688 F.Supp.2d 498, 539-40 (E.D.La.2010). Relying on this discussion, the order rejects the FEC’s motion for summary judgment, stating that “where a coordinated expenditure explicitly conveys that underlying basis, it arguably becomes less symbolic and begins to look more like a 'direct restraint on ... political communication.’ ” Id. at 541 (quoting Buckley, 424 U.S. at 21, 96 S.Ct. at 636.)

. Colorado II, 533 U.S. at 445, 121 S.Ct. at 2360 ("Coordinated spending by a party, in other words, covers a spectrum of activity, as does coordinated spending by other political actors.”); Id. at 467-68, 121 S.Ct. at 2372-73 (Thomas, J. dissenting) ("This definition covers a broad array of conduct, some of which is akin to an independent expenditure.”).

. Cao, 688 F.Supp.2d at 539-40.

. Appellants' Reply Brief, at 10.

. The FEC conceded that the Cao Ad would be at the outer reaches of the FEC's regulatory authority:
Judge [Clement]: Where do you think the Cao ad falls on the spectrum of coordinated expenditures, with respect to first amendment rights?
FEC Counsel: Well, I think in terms of—
Judge [Clement]: Is it within the heartland or is it—
FEC Counsel: I think it's towards the outer boundary, because timing is—
*441 Judge [Clement]: Which outer boundary?
FEC Counsel: The outer boundary of what would be regulable. Because obviously, if it's just about timing there are other things that would make it even more valuable to a candidate such as being able to control more specifically the message itself.

. Justice Thomas explained:
The Court makes this very assumption. See ante, at 464, 121 S.Ct. 2351 (“There is no significant functional difference between a parly's coordinated expenditure and a direct party contribution to the candidate”). To the extent the Court has not defined the universe of coordinated expenditures and leaves open the possibility that there are such expenditures that would not be functionally identical to direct contributions, the constitutionality of the Party Expenditure Provision as applied to such expenditures remains unresolved. See, e.g., ante, at 456, n. 17, 121 S.Ct. 2351. At oral argument, the Government appeared to suggest that the Party Expenditure Provision might not *442 reach expenditures that are not functionally identical to contributions. See Tr. of Oral Arg. 15 (stating that the purpose of the Party Expenditure Provision is simply to prevent someone "from making contributions in the form of paying the candidate’s bills”).

. Citizens United, 130 S.Ct. at 918 ("If there were a valid basis for deciding this statutory claim in Citizens United's favor (and thereby avoiding constitutional adjudication), it would be proper to do so.”).

. The courts of appeals have followed this approach, focusing on the factual allegations underlying the challenge. The Second Circuit explained in Ramos v. Town of Vernon, 353 F.3d 171 (2d Cir.2003):
The present case has never been explicitly characterized as either facial or as-applied. Rather, plaintiffs' complaint without specificity alleges the ways the ordinance has infringed on their rights in their specific circumstances, and then asks for relief. While some of the claims plaintiffs raise are logically analyzed as facial challenges, e.g., *443 the challenges for overbreadth and vagueness, the equal protection claim is more logically viewed "as-applied” given the statements in the complaint. Even if a facial challenge was intended, a facial challenge in the context of the present equal protection claim would logically include within it an as-applied challenge, and thus we cannot ignore the constitutional violation simply because the words "as-applied” were not used.
Id. at 174 n. 1 (citation omitted).
Similarly, in Jacobs v. Florida Bar, 50 F.3d 901 (11th Cir.1995), the Eleventh Circuit explicitly recharacterized a challenge based on the facts before it where the appellants were unable to carry a broader facial attack on rules restricting attorney advertising:
We recognize that Appellants characterized their claim as a facial challenge. We are not, however, bound by Appellants' designation of their claims, as the complaint sets forth a cause of action for an as-applied challenge to the rules. See McKinney v. Pate, 20 F.3d 1550, 1560 (11th Cir.1994) (en banc) ("Our responsibility, however, is to examine [plaintiff's] cause of action for what it actually is, not for what [plaintiff] would have it be,” and thus court looks to complaint to determine what claim plaintiff's allegations support) ...
Id. at 905 n. 17.

. In Citizens United, the Court ignored the plaintiffs' stipulation fore swearing an attack on the corporate contribution ban. 130 S.Ct. at 892-93.

. Colorado I listed several features of an "independent expenditure” which pertain to this inquiry: (1) Whether the party independently decided to create the ad on its own initiative; (2) Whether the party independently developed the ad; (3) Whether the party's leadership independently approved the ad; (4) Whether the party independently decided to circulate the ad; (5) Whether the party claims ownership of the ad within the ad itself; (6) Whether, when viewed objectively, the ad is appears to be the party’s own. Colorado I, 518 U.S. at 613-14, 116 S.Ct. at 2315.

. In a case concerning the criminalization of virtual child pornography, a subject deserving far less First Amendment scrutiny, the Court rejected a similar contention, stating, "[Tjhat protected speech may be banned as a means to ban unprotected speech .... turns the First Amendment upside down.” Ashcroft v. Free Speech Coalition, 535 U.S. 234, 255, 122 S.Ct. 1389, 152 L.Ed.2d 403, (2002).

. The majority is "shocked” to note that the major political parties spent well over $100 million apiece on independent expenditures during the 2008 election. To the contrary, this is not an exorbitant sum. To put this amount in perspective, consider that a mere 24 individuals contributed a total of $142 million to tax-exempt 527 organizations in 2004 and that 527 and 501(c) groups spent more than $400 million in the 2008 federal elections. S. Weissman and R. Hassan, BCRA and the 527 Groups, in The Election After Reform 79, 92-96 (M. Malbin ed.2006); Press Release, Campaign Finance Inst., Soft Money Political Spending by 501(c) Nonprofits Tripled in 2008 Election (Feb. 25, 2009), available at http://www.cfinst.org/Press.aspx. Even this amount of money is a trifle in the world of marketing. A single corporation, Procter & Gamble, annually spends $2.7 billion on advertising to promote its products in the United States. Suzanne Vranica & San Schechner, P&J Signs Ad Deal, Wall St. J., April 22, 2010, at B6.

. The district court found:
49. Because the RNC has a continuous and ongoing relationship with its candidates, spe *449 cial measures must be taken to do independent expenditures regarding its candidates. The RNC has extensive discussions with its candidates about their needs, activities and strategy. As a result, activities by the RNC about its candidates may be deemed to be coordinated with its candidates, subjecting these activities to the FECA's coordinated expenditure and contribution limits. In order to engage in any independent expenditure supporting one of its candidates, the RNC may hire an outside consulting group to do the independent expenditures but neither the RNC nor any of its officers, employees or agents may have any involvement in the independent expenditure in order for it to be truly independent. In fact, neither the chairman of the RNC nor any of the RNC’s officers, employees or agents has control over the message of an independent expenditure yet the RNC hears responsibility for that message. The RNC makes its independent expenditures in this way out of a belief that there is no way to have a true “firewall policy. ” (Emphasis added).